**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

ALONZO BRYANT,                         :
                                       :   Civil Action No. 08-3575 (RMB)
                Petitioner,            :
                                       :
          v.                           :        **O P I N I O N**
                                       :
MICHELLE R. RICCI, et al.,             :
                                       :
                Respondents.           :
_____

**APPEARANCES:**

Alonzo Bryant, Pro Se
#272608/272944B
New Jersey State Prison
P.O. Box 861
Trenton, NJ 08625

Alexis Rebecca Agre, Esq.
Office of the Burlington County Prosecutor
49 Rancocas Road
P.O. Box 6000
Mt. Holly, NJ 08060-6000
Attorney for Respondents

**BUMB, District Judge**

     Petitioner Alonzo Bryant, a prisoner currently confined at

the New Jersey State Prison, Trenton, New Jersey, has submitted a

petition for a writ of habeas corpus pursuant to 28 U.S.C. §

2254.  The respondents are Michelle Ricci, the Administrator of

the New Jersey State Prison, and the Attorney General of New

Jersey.

     For the reasons stated herein, the petition must be denied.

## BACKGROUND

**A.   Factual Background**

The relevant facts are set forth in the opinion of the New Jersey Supreme Court, in the direct appeal of Petitioner's co-defendant, Robert Morton.[1]  See State v. Morton, 155 N.J. 383 (1998), cert. denied, 532 U.S. 931 (2001).

> In two separate events during the night of February 23-24, 1993, two assailants attacked Toby Chrostowski and Michael Eck.  Chrostowski, who was stabbed once in the chest, survived.  Eck, who sustained a total of twenty-four stab wounds, died.
>
> A. Chrostowski Stabbing
>
> At approximately 10:20 p.m. on February 23, Chrostowski drove his BMW automobile into the parking lot of the Playhouse, a go-go bar in Burlington Township.  Chrostowski, who had arranged to meet a co-worker, Brian Land, parked in front of Land's car. He noticed two men staring at him from a Ford Escort parked next to Land's car.  Chrostowski exited his car and walked toward the bar.  His path required him to pass between Land's car and the Ford.
>
> As Chrostowski walked between the cars, the driver of the Ford stepped into Chrostowski's path.  At the same time, the passenger walked around the car and approached Chrostowski from behind.  Chrostowski tried to walk past the driver.  He felt a sharp pain in his chest, but continued into the bar.  On entering the bar, Chrostowski discovered that he was bleeding from a stab wound.

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

He described his attackers as black males, both of
whom were wearing jackets.  The shorter of the two men
was wearing gold-framed glasses and a "different" kind
of hat.  Chrostowski's descriptions matched those of
two men who had just been ejected from the Playhouse
for unruly behavior.  Chrostowski did not know which of
the two men had stabbed him.

B. Eck Stabbing

In the early morning of February 24, approximately
two hours after the Chrostowski stabbing, James Sireci,
a limousine driver, was buying gas at the Amoco station
in Delran.  The attendant pumping gas was Michael Eck.
Sireci saw a maroon Ford Escort pull into the station
and stop by an air pump.  No one, however, left the
Ford.  After paying Eck, Sireci noticed that the Ford
was backing toward his limousine.  Because the Ford
almost hit the limousine, Sireci stared at the
occupants.  The driver was a dark-complexioned male
with a mustache, who was wearing a black wool cap with
a rolled-up brim.  The passenger was a
light-complexioned black male with closely cropped
hair.  Sireci then drove from the station.

Soon after, a 9-1-1 emergency dispatcher received
a call from a public phone located at the Delran Amoco.
The caller, who was gasping for breath, twice said
"Delanco Amoco," but nothing else.  By chance, Officer
Charles Reynolds of the Delran Township Police
Department, who had just completed his shift, arrived
at the Delran Amoco to purchase cigarettes.  On
entering the attendant's office, he saw Michael Eck
lying face up on the floor.  The telephone was dangling
off its hook.  As Officer Reynolds knelt besides him,
Eck said that he had been stabbed in the arm, groin,
and chest.  Eck's shirt and pants were torn and stained
with blood.  Although Eck was having difficulty
breathing, he told Officer Reynolds that he had been
stabbed by two young black men.  The men were driving a
"Gremlin" style vehicle which appeared under the
station's fluorescent lights to be tan in color.

At approximately 12:25 a.m., emergency medical
technicians arrived at the Delran Amoco.  They gave Eck
oxygen and applied pressure bandages to his stab
wounds.  They transported Eck to Memorial Hospital,

3

where he died.  The immediate cause of his death was a
stab wound to his heart.

C. The Investigation

       At approximately 1:05 a.m. on February 24, Officer
William Zielinski went to the emergency room of the
Rancocas Valley Hospital in response to a call
regarding a patient with a knife wound.  The patient
was [Morton].  As Officer Zielinski entered the
hospital, he passed Alonzo Bryant, who was leaving.
Despite the subfreezing temperature, Bryant was not
wearing a coat.

       Inside the hospital, Nurse Mary Costello Armstrong
explained that [Morton] had arrived with Bryant and was
suffering from a spiral laceration on his left index
finger.  Although Bryant had told her that a broken
bottle caused the cut, Nurse Armstrong recognized it as
a knife wound.  She believed that [Morton] was lying
and suspected his injury was related to the stabbing of
Chrostowski, whom she had treated earlier in the
evening.

       Officer Zielinski interviewed [Morton], whom he
described as a short, stocky, black male wearing
gold-rimmed glasses and a short-sleeved shirt. [Morton]
was not wearing a coat.  He said that a stranger had
injured him at a bar in Trenton, but did not know the
name or location of the bar. [Morton] also declined
Officer Zielinski's offer to pursue further legal
action against his assailant.  Officer David Barnes,
who arrived at the hospital to serve as a backup,
described [Morton]'s demeanor as curt and evasive.
When Detective Dean Potts of the Delran Police
Department arrived, [Morton] repeated that he had been
injured by an unknown assailant at an unnamed Trenton
bar.

       [Morton] left the hospital accompanied by two
women.  Detective Potts followed them in his patrol car
as they left on foot. [Morton] wore only a
short-sleeved shirt.  On noticing that a police car was
following them, [Morton] and his companions began to
run.  Detective Potts followed them until they entered
a Burlington apartment complex.

On the afternoon of February 24, Frances Robinson and Paula Palmo-Reeves, who were exotic dancers at the Playhouse, along with their manager and a Playhouse bouncer, met with a police sketch artist.  The purpose of the meeting was to obtain a description of the two men who had been ejected from the bar just before Chrostowski's stabbing.  The two women described one man as a short, stocky, black male who wore gold-rimmed glasses and a fishing-style Raiders hat.  The other man was a taller, thinner black male, whose conduct had caused both men to be ejected from the bar.

Later that evening, Robinson was driving on Route 130 with her boyfriend, Brian Land, when she noticed [Morton] driving alongside in his maroon Ford Escort. She recognized [Morton] as the short, stocky male who had been in the Playhouse the previous night. [Morton] again was wearing gold-rimmed glasses and his Raiders fishing hat.  Land called the police on his car phone, and Robinson described [Morton] and his car.  Robinson also gave the police a partial license plate number and said that [Morton] had turned off Route 130 into the Edgewater Park McDonald's Restaurant.

Patrolman Robert Hess of the Edgewater Park Police Department went to McDonald's at 12:25 a.m. on February 25.  He discovered that [Morton]'s car was not listed in the police department's mobile data terminal information database, indicating that the car was either unregistered or stolen.  While inspecting the car, [Morton] emerged from McDonald's wearing an employee uniform.  When asked by Patrolman Hess for his name and address, [Morton] gave his name as Robert Moore, gave his aunt's phone number and address as his own, and admitted that he owned the car.  Patrolman Hess reported the information to the Burlington City Police Department.

On that same morning, Beverly Cuffie called the Willingboro Police to report that her daughter, Vicky Williams, knew something about the Amoco station robbery.  Officer David Barnes went to Cuffie's apartment to interview Williams.  Also present was Bernard Harper, who was both Williams's boyfriend and Bryant's brother.  Williams explained that Bryant's girlfriend, Annie Edwards, had called her with information about the robbery.  According to Williams, Edwards said that, in the early morning of February 24,

Bryant and [Morton] arrived at her apartment.  They told her that they had robbed a gas station and stabbed the attendant.  Harper explained that he too knew of [Morton]'s and Bryant's activities.  He went to the police station and gave a taped statement.

In the statement, Harper related that at 9:00 p.m. on February 23, [Morton] and Bryant drove him to Williams's apartment.  At the time, [Morton] was wearing glasses and a Raiders fishing hat. Additionally, [Morton] and Bryant were wearing green surgical gloves, and both possessed knives.  Bryant told Harper that he planned to "get somebody, kill somebody and get some money." [Morton] and Bryant drove Harper to Williams's house and then to his aunt's house.  Harper did not see either of them again until early the next morning when they returned to his aunt's house.  At that time, [Morton] had blood on his jacket and a cut on his left hand.  Bryant took [Morton] to Rancocas Valley Hospital.  Sometime thereafter, Bryant called Harper to tell him that the police were interviewing [Morton] at the hospital, and to ask if the police had come to his aunt's house looking for them.  When Harper saw Bryant later that day, Bryant said that he had done something that he did not want to talk about.  Bryant then gave Harper $25 dollars from a "knot" of bills in Bryant's pocket.

Police also obtained statements from Annie Edwards, Bryant's girlfriend, and Carolyn Bennett, Edward's roommate.  The two women explained that [Morton] and Bryant arrived at their apartment sometime after midnight on February 24.  At the time, [Morton] was wearing a Raiders fishing hat and a blood-stained jacket. [Morton] and Bryant went to the bathroom to treat a cut on [Morton]'s finger. Thereafter, Bryant took four cartons of cigarettes from his jacket.  He asked Edwards to count a blood-stained wad of money, which totaled approximately $200.

Sometime thereafter, Bryant returned to the apartment alone.  He explained that he and [Morton] had robbed the Amoco station.  While Bryant beat the victim, [Morton] stabbed him.  At Bryant's request, the two women went to the hospital, where they observed [Morton] speaking with police officers.

6

When returning from the hospital, [Morton] told the women that he had cut his finger in a bar fight. The women, however, told [Morton] that Bryant had already told them about the gas station robbery. [Morton] then admitted that he had cut himself when his knife folded back on his finger as he was stabbing Eck. [Morton] related that he had stabbed Eck as Bryant beat him.  Demonstrating how he had stabbed Eck, [Morton] said that he believed that they had killed Eck.  He boasted that "there was one less cracker that he would have to worry about."  The women understood the word "cracker" to mean a white person.

Back at the apartment, [Morton] and Bryant spoke of their plan to "hit either a bank or another gas station."  They laughed and joked as they described Eck's murder.  Bryant told the women that [Morton] had stabbed Eck in the genitals, a statement [Morton] did not deny.  According to Bryant, Eck called him "nigger" while being beaten and stabbed.  Finally, Bryant said [Morton] had stabbed Eck with his knife.  Bryant then disposed of [Morton]'s knife by throwing it somewhere between Cinnaminson and Willingboro.  While at the house, Bryant placed [Morton]'s bloody jacket in the washing machine.

Based on this information, Police Captain Michael King decided to arrest [Morton] and Bryant for the murder of Michael Eck.

Morton, 155 N.J. at 398-404.

## B.   **Procedural Background**

On September 16, 1993, a Burlington County Grand Jury returned an indictment charging Petitioner and co-defendant Robert Morton.  Petitioner was charged with first-degree capital murder of Michael Eck, first-degree murder of Eck, first-degree robbery of Eck, and first-degree robbery while armed with a knife.  Petitioner was also charged, along with Morton, with first-degree criminal attempt of murder of Chrostowski, first

degree robbery with a knife, first-degree robbery of Chrostowski, second-degree aggravated assault of Chrostowski, and third-degree aggravated assault of Chrostowski with a knife, all in violation of New Jersey state law.

On October 15, 1993, the Burlington County Prosecutor's Office served Petitioner with a Notice of Aggravating Factors, pursuant to New Jersey law, designating the case as a capital prosecution.

Pretrial motions were extensive, and included a motion to suppress Petitioner's statements to the police, which was denied. The guilt phase of the trial began on December 16, 1996.  On January 30, 1997, the jury acquitted Petitioner of capital murder, but convicted him of purposeful or knowing murder of Eck and felony murder of Eck, the first-degree robbery of Eck, the first-degree robbery of Chrostowski, and both counts of aggravated assault against Chrostowski.  The jury was unable to reach a verdict on the charge of attempted murder of Chrostowski.

Petitioner's motion for a new trial was denied on April 11, 1997, and Petitioner was sentenced pursuant to an extended term sentence.  Petitioner's aggregate sentence was two life terms, with a 55-year parole disqualifier.

Petitioner appealed.  On February 2, 2000, the Superior Court of New Jersey, Appellate Division ("Appellate Division") affirmed the conviction and sentence.  Petitioner filed a

petition for certification with the New Jersey Supreme Court, which was denied on May 11, 2000.

On November 3, 2000, Petitioner filed a motion for post-conviction relief (PCR) in the sentencing court.  The motion was denied on June 30, 2005.  Petitioner appealed the denial, and on August 13, 2007, the Appellate Division affirmed the denial. Petitioner's petition for certification to the New Jersey Supreme Court was denied on January 18, 2008.

Petitioner filed this habeas petition on July 14, 2008. Petitioner was advised of his rights pursuant to Mason v. Meyers, 208 F.3d 414 (3d Cir. 2000), on September 3, 2008.  On October 23, 2008, an Order to Answer was issued to Respondents. Respondents filed an Answer to the petition and the available state court record on or about May 18, 2009.  Petitioner filed objections to the answer on November 16, 2010.

**C.   Petitioner's Claims**

Petitioner cites fifteen grounds for relief in his habeas petition:

1.   The court abused its discretion in denying Petitioner's motion to sever certain counts of the indictment because the prejudice of joinder outweighed the interests of judicial economy.

2.   Petitioner's oral and written statements should have been suppressed because they were induced by material representations by the police that Petitioner would not be subject to the death penalty.

3.   The court erred in denying Petitioner's motion for a mistrial made immediately after the prosecutor said in his

opening statement that "there are no living witnesses to what happened except Robert Morton and Alonzo Bryant."

4.   The trial court abused its discretion and committed reversible error in permitting Detective-Sergeant Ryan to testify that co-defendant Morton, and other non-testifying persons, had implicated Petitioner in the Eck Murder because that violated Petitioner's Sixth Amendment right to confrontation.

5.   The court abused its discretion in admitting testimony that the Petitioner planned to commit a bank robbery as other bad acts evidence.

6.   Petitioner's conviction should be reversed because Dr. Smialek's pretrial "presentation" violated defendant's right to a fair trial by altering substantially material evidence.

7.   The deliberate failure of the Assistant Prosecutor to present significant Brady material to the Grand Jury violated Petitioner's due process of law.

8.   The State's use of co-defendant's statement at the Grand Jury proceedings to obtain an indictment in this case violated Petitioner's constitutional rights.

9.   Ineffective assistance of trial counsel violated Petitioner's rights.

10.  The jury instructions did not adequately reflect or convey accomplice liability, depriving Petitioner's of his constitutional rights.

11.  There was a gross insufficiency of evidence in this case, in violation of Petitioner's rights.

12.  Petitioner's right to testify at trial was violated when he was erroneously advised by trial counsel not to do so, rendering ineffective assistance of counsel.

13.  Petitioner's right to effective counsel was violated by trial counsel when they "opened the door" to damaging testimony on the redirect examination of Detective Ryan.

14.  It was reversible error for the trial court to exclude that portion of the co-defendant's inculpatory statement concerning his stabbing of Michael Eck from the jury in Petitioner's trial.

15.   The trial court improperly interfered with defense counsel's
      argument to the jury about reasonable doubt by giving the
      jury an erroneous "corrective" charge on reasonable doubt.

(Petition, Addendum to Petition).

## 28 U.S.C. § 2254

As amended by the Antiterrorism and Effective Death Penalty

Act of 1996 (AEDPA), 28 U.S.C. § 2254 now provides, in pertinent

part:

> (a) The Supreme Court, a Justice thereof, a circuit
> judge, or a district court shall entertain an
> application for a writ of habeas corpus in behalf of a
> person in custody pursuant to the judgment of a State
> court only on the ground that he is in custody in
> violation of the Constitution or laws or treaties of
> the United States.
>
> With respect to any claim adjudicated on the merit
> s in state court proceedings, the writ shall not issue
> unless the adjudication of the claim
>
> > (1) resulted in a decision that was contrary to,
> > or involved an unreasonable application of,
> > clearly established Federal law, as determined
> > by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on
> > an unreasonable determination of the facts in
> > light of the evidence presented in the State
> > court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court

precedent "if the state court applies a rule that contradicts the

governing law set forth in [Supreme Court] cases," or "if the

state court confronts a set of facts that are materially

indistinguishable from a decision of th[e] Court and nevertheless

11

arrives at a result different from [the Court's] precedent."
Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (O'Connor, J.,
for the Court, Part II).  A state court decision "involve[s] an
unreasonable application" of federal law "if the state court
identifies the correct governing legal rule from [the Supreme]
Court's cases but unreasonably applies it to the facts of the
particular state prisoner's case," and may involve an
"unreasonable application" of federal law "if the state court
either unreasonably extends a legal principle from [the Supreme
Court's] precedent to a new context where it should not apply or
unreasonably refuses to extend that principle to a new context
where it should apply," (although the Supreme Court expressly
declined to decide the latter).  Id. at 407-09.  To be an
"unreasonable application" of clearly established federal law,
the state court's application must be objectively unreasonable.
Id. at 409.  In determining whether the state court's application
of Supreme Court precedent was objectively unreasonable, a habeas
court may consider the decisions of inferior federal courts.  See
Matteo v. Superintendent, 171 F.3d 877, 890 (3d Cir. 1999).

Even a summary adjudication by the state court on the merits
of a claim is entitled to § 2254(d) deference.  See Chadwick v.
Janecka, 302 F.3d 107, 116 (3d Cir. 2002) (citing Weeks v.
Angelone, 528 U.S. 225, 237 (2000)).  With respect to claims
presented to, but unadjudicated by, the state courts, however, a

12

federal court may exercise pre-AEDPA independent judgment.  See Hameen v. State of Delaware, 212 F.3d 226, 248 (3d Cir. 2000), cert. denied, 532 U.S. 924 (2001); Purnell v. Hendricks, 2000 WL 1523144, *6 n.4 (D.N.J. 2000).  See also Schoenberger v. Russell, 290 F.3d 831, 842 (6th Cir. 2002) (Moore, J., concurring) (and cases discussed therein).

The deference required by § 2254(d) applies without regard to whether the state court cites to Supreme Court or other federal case law, "as long as the reasoning of the state court does not contradict relevant Supreme Court precedent." Priester v. Vaughn, 382 F.3d 394, 398 (3d Cir. 2004) (citing Early v. Packer, 537 U.S. 3 (2002); Woodford v. Visciotti, 537 U.S. 19 (2002)).

Although a petition for writ of habeas corpus may not be granted if the Petitioner has failed to exhaust his remedies in state court, a petition may be denied on the merits notwithstanding the petitioner's failure to exhaust his state court remedies.  See 28 U.S.C. § 2254(b)(2); Lambert v. Blackwell, 387 F.3d 210, 260 n.42 (3d Cir. 2004); Lewis v. Pinchak, 348 F.3d 355, 357 (3d Cir. 2003).

Finally, a pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers.  See Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972).  A pro se habeas petition and any

13

supporting submissions must be construed liberally and with a measure of tolerance.  <u>See</u> <u>Royce v. Hahn</u>, 151 F.3d 116, 118 (3d Cir. 1998); <u>Lewis v. Attorney General</u>, 878 F.2d 714, 721-22 (3d Cir. 1989); <u>United States v. Brierlev</u>, 414 F.2d 552, 555 (3d Cir. 1969), <u>cert.</u> <u>denied</u>, 399 U.S. 912 (1970).

<u>**DISCUSSION**</u>

**A.   <u>Claim Regarding Joinder and Motion to Sever (Ground 1).</u>**

Petitioner argues in Ground One of his petition that the Eck homicide and the Chrostowski attack, which occurred three hours earlier than the homicide, should not have been joined at trial, because joinder deprived him of a fair trial.

The Appellate Division considered this argument and rejected it on direct appeal.  <u>See</u> Respondents' Appendix ("Ra") 7.

The Supreme Court has observed that "[i]mproper joinder does not, in itself, violate the Constitution.  Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." <u>United States v. Lane</u>, 474 U.S. 438, 446 n.8 (1986).  Denial of a motion to sever violates due process "only if there is a serious risk that a joint trial would compromise a specific right of .. the defendant[ ], or prevent a jury from making a reliable judgement about guilt or innocence." <u>Zafiro v. United States</u>, 506 U.S. 532, 539 (1993). Moreover, "a fair trial does not include the right to exclude

14

relevant and competent evidence." Id. at 540 (citation and
internal quotation marks omitted).

In this case, the joinder of the charges of concerning the
Chrostowski incident and the Eck murder allowed the state to
present the full chronology of related events, avoided the need
to repeat evidence at separate trials, and did not compromise a
specific right of Petitioner or prevent the jury from reliably
judging Petitioner's guilt or innocence. Petitioner and Morton's
"aborted attempt to rob Chrostowski were part of their common
plan. The plan included their lack of success at the [Cherry
Hill] night club, and culminated in the stabbing and robbery of
Eck." Morton, 155 N.J. at 451-52. Further, evidence regarding
the armed robbery of Chrostowski helped to establish Petitioner's
identity in the Eck murder. Witnesses at the night club of the
Chrostowski incident provided critical links to the police
investigation of Eck's murder.

Finally, Petitioner has not demonstrated prejudice
attributed to the joinder. He received a hung jury on the charge
of attempted murder of Chrostowski, which evidenced that the
jurors were able to comply with the trial judge's charge that
they find each element of each count beyond a reasonable doubt.

Thus, joinder of charges did not deny Petitioner a fair
trial and the New Jersey courts' adjudication of the claim was
not contrary to, or an unreasonable application of Lane or other

15

Supreme Court holdings. <u>See</u> <u>Cummings v. Sirmons</u>, 506 F.3d 1211,
1239 (10th Cir. 2007) (where "it seems inconceivable that the
State could have prosecuted Cummings for Melissa's murder without
being permitted to provide the jury with some evidence regarding
the events leading up to Melissa's death," failure to sever was
not unreasonable application of Lane ); <u>Davis v. Coyle</u>, 475 F.3d
761, 777 (6th Cir. 2007) ("By allowing joinder of offenses, the
possibility exists that a jury may use the evidence of one of the
charged crimes to infer a general criminal disposition by the
defendant; the jury also may confuse or cumulate the evidence of
the various crimes charges.  The prejudice that Davis must
demonstrate, however, in order to justify a grant of a writ of
habeas corpus is actual prejudice, not merely the potential for
prejudice") (citations omitted; emphasis in original); <u>Comer v.
Schiriro</u>, 463 F.3d 934, 957-59 (9th Cir. 2006) (state death
penalty trial was not rendered fundamentally unfair by joinder of
homicide count with kidnapping, robbery and sexual assault
charges, since some evidence was admissible as to all counts,
jury instruction limited prejudice, and evidence relating to all
counts was strong); <u>Johnson v. Bett</u>, 394 F.3d 1030 1037 (7th Cir.
2003) (joinder of defendants did not violate due process where
"[t]rying them together allowed the State to present a chronology
of what happened" and avoided repetition of evidence at separate
trials); <u>Herring v. Meachum</u>, 11 F.3d 374, 377-78 (2d Cir. 1993)

("where a defendant is claiming a due process violation based upon joinder of offenses, he must, to succeed, go beyond the potential for prejudice and prove that actual prejudice resulted from the events as they unfolded during the joint trial").

**B.    Suppression Claim (Ground 2).**

In Ground Two of his petition, Petitioner argues that the statements he made to police should have been suppressed, as they were induced by false representations by police.  In particular, Petitioner states that Detective-Sergeant Ryan testified that he intended Petitioner to infer that if he was truthful and cooperative, he would be helping himself, and would be in control of his destiny.  Ryan also testified that he made Petitioner believe there was an eyewitness who observed Petitioner standing over Eck's body, and that he played portions of Morton's retracted taped statement for Petitioner.  Ryan also did not deny that he drew a diagram of Petitioner's possible sentences. Liberally construing the petition, Petitioner alleges that his Fifth Amendment rights were violated in the procedures used by police to obtain his incriminating statements, and that the statements, and evidence collected as a result of the statement, should have been suppressed from trial.

A pretrial hearing was held, in which the trial court considered the arguments concerning Petitioner's statements.  See Rta 5, Rta 6, Rta 7 (docket entries 9-16 through 9-24).  The

17

trial court held that Petitioner made a knowing and intelligent waiver of his right to remain silent, his right to be represented by an attorney, and was properly advised of his rights.  The fact that police made false statements to Petitioner did not render the statements inadmissible.  <u>See</u> Rta7 at 41:16-17; 42:20-25. The Appellate Division also considered Petitioner's argument and rejected it.  <u>See</u> Ra 7.

The Fifth Amendment provides, in part, that no person "shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  The Fourteenth Amendment incorporates the Fifth Amendment privilege against self-incrimination.  <u>See</u> <u>Malloy v. Hogan</u>, 378 U.S. 1, 8 (1964).  In <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), the Court held that "without proper safeguards the process of in-custody interrogation ... contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely."  384 U.S. at 467.  When police ask questions of a suspect in custody without administering the required warnings, <u>Miranda</u> dictates that the answers received be presumed compelled and that they be excluded from evidence at trial in the State's case in chief. <u>See</u> <u>Oregon v. Elstad</u>, 470 U.S. 298, 317 (1985).  Thus, a confession taken during a custodial interrogation without the

provision of Miranda warnings violates the privilege against self incrimination.  See Thompson v. Keohane, 516 U.S. 99 (1995).

"To safeguard the uncounseled individual's Fifth Amendment privilege against self-incrimination, the Miranda Court held, suspects interrogated while in police custody must be told that they have a right to remain silent, that anything they say may be used against them in court, and that they are entitled to the presence of an attorney, either retained or appointed, at the interrogation."  Thompson, 516 U.S. at 107; see also Miranda, 384 U.S. at 479.  The Miranda Court outlined the procedures to be followed after the police provide these warnings.  If the accused requests counsel, then "the interrogation must cease until an attorney is present."  Miranda, 384 U.S. at 474.

Petitioner's allegation that the state courts erred in denying his Miranda suppression motion lacks merit.  The state courts invoked the correct law, held a pretrial hearing, and reasonably determined the facts in light of the evidence presented.  Based on a review of the record, including the pretrial Miranda hearing, this Court can fathom no reason to upset the findings of the state court.  See Fahy v. Horn, 516 F.3d 169, 196 (3d Cir. 2008) (state court decision to reject petitioner's request for suppression was not "contrary to" Supreme Court precedent, as state court adhered to the correct standard; further, "the suppression court was entitled to make

19

the credibility determination that it did in the face of
conflicting testimony, and it applied the correct law to its
findings of fact and came to a reasonable conclusion").

Furthermore, as noted in co-defendant's case, the mere fact
that police used psychological techniques does not render
Petitioner's statements involuntary.  See Morton, 155 N.J. at
450.  During the course of an interrogation, it is generally
recognized that the police may use some psychological tactics in
eliciting statements from a suspect.  See Frazier v. Cupp, 394
U.S. 731, 739 (1969)("The fact that the police misrepresented the
statements that Rawls had made is, while relevant, insufficient
in our view to make this otherwise voluntary confession
inadmissible.  These cases must be decided by viewing the
'totality of the circumstances' . . . .");  Miller v. Fenton, 796
F.2d 598, 605 (3d Cir.), cert. denied, 479 U.S. 989 (1986); State
v. Jacks, 634 F.2d 390, 393 (8th Cir.), cert. denied, 450 U.S.
934 (1981)(representation that cooperation would promote
leniency, although no actual promise was made).  The police may
"attempt to create a climate which would be conducive to
extracting inculpatory information."  United States v. Boyce, 594
F.2d 1246, 1251 (9th Cir. 1979)("In our case, the FBI agents may
have attempted to create a climate which would be conducive to
extracting inculpatory information.  However, a fair reading of
the whole record of Boyce's interrogation supports the district

20

court's finding that Boyce's confession was voluntary.  Nothing in the record suggests that his will was in any respect overborne.").  This claim for habeas relief will be denied.

**C.   Claim Regarding Prosecutor's Opening Statement (Ground 3).**

In Ground 3 of his petition, Petitioner argues that in the opening statements, the prosecutor commented on his right to remain silent, when the prosecutor stated: "There are no living witnesses to what happened next, except Robert Morton and Alonzo Bryant.  But the police officers were able to put together a pretty good picture of what it was."  See Rta9 at 80:4-22.  Although Petitioner styles his argument as challenging the trial court's denial of his motion for a mistrial based on the statement, the Court construes the claim as one of prosecutorial misconduct.

The United States Supreme Court has recognized the obligation of a prosecutor to conduct a criminal prosecution with propriety and fairness.

> He may prosecute with earnestness and vigor-indeed, he should do so.  But, while he may strike hard blows, he is not at liberty to strike foul ones.  It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.... Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.

Berger v. United States, 295 U.S. 78, 88 (1935).  "The line separating acceptable from improper advocacy is not easily drawn

21

there is often a gray zone.  Prosecutors sometime breach their duty to refrain from overzealous conduct by commenting on the defendant's guilt and offering unsolicited personal views on the evidence." <u>United States v. Young</u>, 470 U.S. 1, 7 (1985).

The Fifth Amendment forbids the prosecution from commenting on a defendant's failure to testify, as such comment would penalize the defendant from exercising his right against self-incrimination.  <u>See</u> <u>Griffin v. California</u>, 380 U.S. 609 (1965).  The test to determine if a prosecutor's remarks concerning a defendant's failure to testify is "whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." <u>Bontempo v. Fenton</u>, 692 F.2d 954, 959 (3d Cir. 1982), <u>cert.</u> <u>denied</u>, 460 U.S. 1055 (1983).

Further, under United States Supreme Court precedent, where a prosecutor's opening or closing remarks are challenged in habeas, "[t]he relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986) (quoting <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637 (1974)).  In evaluating the likely effect of improper comments, a court may consider whether the improper comments were invited by or responsive to prior comments by opposing counsel.  <u>See</u> <u>Darden</u>, 477 U.S. at 181-82.  Thus,

22

"Supreme Court precedent counsels that the reviewing court must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." Moore v. Morton, 255 F.3d 95, 107 (3d Cir. 2001).

The trial judge examined this claim in denying the motion for a mistrial, finding that the prosecutor merely made "an observation that in the murder case there's no direct witness of the moments when the attack took place available to the State. It has to be developed from other methods." See Rta9 at 97:13-24. The Appellate Division reviewed this claim on direct appeal and found it to be without merit. See Ra7.

This Court agrees with the state courts that nothing in the prosecutor's remarks, taken in light of the trial and evidence as a whole, deprived Petitioner of his right to a fair trial. The prosecutor's comments were not stressing that Petitioner failed to testify at trial; rather the prosecutor was addressing the fact of no witnesses. Further, Petitioner was not prejudiced by the remarks, considering the evidence against Petitioner, and in context of the entire trial.[2] Thus, the prosecutor's opening

---

[2] Evidence against Petitioner included boasting in front of his brother that he intended to supplement his income from a fast food restaurant by robbing and killing (Rta11 at 136:2-7, 137:14, 138:8, 145:1 to 147:18); Petitioner and Morton armed themselves with large folding knives so as not to leave witnesses and wore

statement did not deny Petitioner a fair trial and the New Jersey courts' adjudication of the claim was not contrary to, or an unreasonable application of Supreme Court holdings.  As such, this habeas claim must be denied.

**D.    Evidence Rulings at Trial (Grounds 4-6, 14).**

In Ground 4, Petitioner argues that the trial court erred in permitting Detective-Sergeant Ryan to testify under cross-examination that Morton and other persons had implicated Petitioner in the Eck murder, and that he "suggested" to Petitioner that it would be in his best interests to speak with him.  Ryan's testimony began to resemble hearsay, there was a sidebar, and there was an issue after sidebar because defense counsel wanted to switch topics, while the prosecutor sought the witness' answer.  At another sidebar, defense counsel asked for a

---

latex gloves so as not to leave fingerprints (Rta11 at 138:12-17, 138:18-20, 139:23 to 143:20, 152:3-5, Rta19 at 76:4-15); before getting out of the car at the Amoco station, Morton advised Petitioner, "When I get out, I'm killing everyone around, 'cause I ain't leaving no witnesses behind" (Rta15 at 147:17-25, Rta18 at 78:23 to 79:25); aware of Morton's deadly intentions, Petitioner at the very least robbed the attendant's booth of money and cigarettes (Rta15 at 148:7-12, Rta18 at 80:21 to 81:4); Eck's statement to police prior to his death that he was attacked by two black men (Rta11 at 103:8-19); Petitioner's knife was the knife that inflicted the cardiac wound (see Rta19, Rta20); Petitioner's knife was recovered from inside his sneaker, and his fingerprint was on the blade (Rta11 at 52:20 to 53:5, Rta15, Rta17 at 128:22 to 136:1, Rta18 at 12:15-19, 48:6 to 49:25); and Petitioner and Morton's statements implicating Petitioner (Ra20 to Ra 23).  In addition, there were statements of third party witnesses, the identification of Petitioner and Morton by witnesses in photographs, and DNA evidence.

mistrial because Ryan testified that Bryant was implicated in the murder.  The judge denied the motion for mistrial and gave a limiting instruction.  <u>See</u> Rta16 at 68 to 75 (cross), and 105-108 (redirect).

In Ground 5, Petitioner argues that the trial court abused its discretion in admitting other bad acts evidence under the New Jersey Rules of Evidence, Rule 404(B) that Petitioner planned to commit a bank robbery.  Finally, in Ground 6, Petitioner contends that the State's expert witness' testimony altered material evidence and violated his right to a fair trial, as the expert's "presentation" in inserting the knife into the clothing worn by Eck to determine if the knife caused any wounds was improper.

In Ground 14, Petitioner argues that the trial judge committed reversible error when he excluded the portion of Morton's inculpatory statement concerning his stabbing of Eck from the jury.  The trial court admitted the portion of the statement that read, "I did it, I'm sorry but that don't bring the man back."  <u>See</u> Rta23 at 7-9, 12).  Petitioner argues that the portion of the statement where Morton describes how a "black cloud" came over him when he did the stabbing, should have been admitted.

Petitioner presented these arguments to the state courts on direct appeal.  The Appellate Division rejected the claims.  <u>See</u> Ra7.  As to Ground 5, in co-defendant Morton's direct appeal, the

25

New Jersey Supreme Court agreed with the trial court in its conclusion that "the relevance of the plan" to rob the bank "to [Morton's] state of mind outweighed its prejudicial effect." Morton, 155 N.J. at 452.

It is well-established that "the Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules." Marshall v. Lonberger, 459 U.S. 422, 438 n.6 (1983). The admissibility of evidence is generally a question of state law which is not cognizable under habeas review. See Keller v. Larkins, 251 F.3d 408, 416 n.2 (3d Cir. 2001) ("A federal habeas court, however, cannot decide whether the evidence in question was properly allowed under the state law of evidence"); Hickey v. Jeffes, 571 F.2d 762, 766 (3d Cir. 1978) ("As to the contention that the trial court erred in admitting the victim's testimony of a prior flirtatious conversation, we find that, if there was any error in the court's ruling ... that error was at best one of interpretation of the state's law of evidence and did not arise to constitutional dimensions").

In cases not governed by the AEDPA, the Third Circuit has held that the admission of evidence may violate due process where the evidence "undermine[d] the fundamental fairness of the entire trial." Keller v. Larkins, 251 F.3d 408, 413 (3d Cir. 2001); see also Lesko v. Owens, 881 F.2d 44, 51 (3d Cir. 1989) ("the

26

erroneous admission of evidence that is relevant, but excessively inflammatory, might rise to the level of a constitutional violation"); Bisaccia v. Attorney General of State of New Jersey, 623 F.2d 307, 313 (3d Cir. 1980) (when "the probative value of ... evidence, though relevant, is greatly outweighed by the prejudice to the accused from its admission, then use of such evidence by a state may rise to the posture of fundamental fairness and due process of law"). But § 2254(d)(1) of the AEDPA does not permit this Court to grant habeas relief based on Third Circuit precedent. Nevertheless, the admission of this evidence would not meet the Third Circuit standard in any event.

As to Petitioner's claim in Ground 4 regarding Ryan's testimony that Morton had implicated him in the Eck murder, this Court finds that the admissibility of evidence was a state court matter, which the trial court considered, and ruled the statement as admissible nonhearsay evidence to show what prompted Petitioner to confess. The trial judge gave a limiting instruction to the jury as to what they could consider regarding Morton's statement. The court instructed the jury not to speculate about what Morton said. Considering the evidence presented to the jury against Petitioner, it cannot be said that Ryan's testimony "undermine[d] the fundamental fairness of the entire trial."

27

Likewise, Petitioner claims in Ground 14 that the trial court should not have excluded co-defendant Morton's statement from the jury.  While the trial judge read the portion of Morton's statement in which he stated that he "did it, I'm sorry but that don't bring the man back," he did not allow the entire statement into evidence.  The record reveals that Morton's first statement placed the entire blame for the Eck murder on Petitioner.  The second statement incriminated both Petitioner and Morton in the murder.  The trial judge's compromise regarding the admitted portion of the statement, where Morton admits to stabbing Eck, without mention of Morton's statement which would incriminate Petitioner, greatly benefitted Petitioner.  Thus, this Court finds that the state courts thoroughly examined the issue and made no error that would undermine the fundamental fairness of the trial.  This Court agrees that the evidence against Petitioner was overwhelming and that the error, if any, was harmless.

As to Petitioner's claim in Ground 5 that the other bad acts evidence should not have been admitted into trial, this Court is not aware of any Supreme Court case clearly establishing that the admission of other crimes or bad acts evidence constitutes a violation of federal constitutional rights, and Supreme Court cases suggest the contrary.  See, e.g., Estelle v. McGuire, 502 U.S. 62 (1991) (allowing evidence of prior injuries in a trial

for infant murder); <u>Spencer v. Texas</u>, 385 U.S. 554 (1967) (rejecting due process challenge to admission of evidence of prior similar crimes when judge gives limiting instruction). "[The Supreme] Court has held on numerous occasions that it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." <u>Knowles v. Mirzayance</u>, --- U.S. ----, 129 S.Ct. 1411, 1419 (2009) (quotations omitted).  Because the admission of the testimony that Petitioner was planning on robbing a bank was not contrary to, or an unreasonable application of clearly established federal law, as determined by the Supreme Court, Petitioner is not entitled to habeas relief under Ground Five.  <u>See</u> <u>Albrecht v. Horn</u>, 485 F.3d 103, 128 (3d Cir. 2007) ("Where evidence of a defendant's prior bad acts is admitted, a defendant's interests are protected by a limiting instruction, which mitigates the possibility of prejudice"); <u>Charlton v. Franklin</u>, 503 F.3d 1112, 1115 (10th Cir. 2007) (state court's admission of evidence of petitioner's prior bad acts did not render trial fundamentally unfair or warrant habeas relief); <u>Minett v. Hendricks</u>, 135 Fed. Appx. 547 (3d Cir. 2005) (rejecting claim that admission of "other crimes" evidence is contrary to or an unreasonable application of clearly established Supreme Court precedent).

Finally, as to Ground 6, Petitioner's claim that the State's expert witness' testimony altered material evidence, does not warrant habeas relief.  In his testimony, the witness used the knife to demonstrate various stab wounds and motions on Eck's clothing.  See Rta19.  The witness was subject to cross-examination, and both the witness and an investigator testified after watching the demonstration that the witness did not alter or destroy the evidence.

In addition Petitioner presented countering evidence through an expert witness, and through cross-examination of the State's witness, and direct examination of the defense's countering expert witness, raised the theory of the altered evidence before the jury.  Defense counsel urged jurors to compare the holes in the garments with photographs to see if they were "changed," (Rta26 at 28:5-14) and the trial judge charged that the defense witness "claimed that by passing the blade of [Petitioner's knife] during his examination [the State's expert witness] altered the defect so that it is no longer possible to get reliable measurements from the defect.  You will make your own judgments about whether or not this is true." (Rta26 at 172:16-24).  Thus, the issue was one for the jury to resolve.  This Court finds that the State's expert witness' demonstration to the jury did not "undermine[d] the fundamental fairness of the entire trial."

30

As Petitioner has not demonstrated that the New Jersey courts' adjudication of these evidentiary claims was contrary to, or an unreasonable application of Supreme Court holdings, the claims must be denied.

**E.   Grand Jury Claims (Grounds 7 and 8).**

In Ground 7, Petitioner argues that the State's use of Morton's statement before the Grand Jury to obtain an indictment violated his constitutional rights, as the prosecutor made only a passing reference to the second statement by Morton that tended to exonerate him from the most serious aspect of the criminal activity.  In Ground 8, Petitioner argues that it was illegal for the prosecutor to use the co-defendant's statement before the Grand Jury, as it violated his right to confront his accuser, and to cross-examine the statement.

This Court notes that the Fifth Amendment right to an indictment by a Grand Jury does not apply to state criminal prosecutions.  See Apprendi v. New Jersey, 530 U.S. 466, 477 n.3 (2000); Albright v. Oliver, 510 U.S. 266, 272 (1994); Hurtado v. California, 110 U.S. 516 (1884). Because the Due Process Clause of the Fourteenth Amendment has not been construed to incorporate the Fifth Amendment right to indictment by a Grand Jury, id., the legality of an indictment is a matter of state law, see United States ex rel Wojtycha v. Hopkins, 517 F.2d 420, 425 (3d Cir. 1975).  Accordingly, "there is no federal constitutional

31

impediment to dispensing entirely with the grand jury in state prosecutions." <u>Beck v. Washington</u>, 369 U.S. 541, 545 (1962); <u>see also</u> <u>Gerstein v. Pugh</u>, 420 U.S. 103, 118-19 (1975) ("the accused is not 'entitled to [federal] judicial oversight or review of the decision to prosecute").

Thus, any claim of defect in a state grand jury proceeding is a claim of a state law error that does not raise federal constitutional concerns unless it rises to the level of a due process deprivation.  <u>See</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 68 (1991).  <u>Cf.</u> <u>United States v. Console</u>, 13 F.3d 641, 671-72 (3d Cir. 1993) (with the exception of a claim of racial discrimination in the selection of grand jurors, a petit jury's guilty verdict renders harmless any prosecutorial misconduct before the indicting grand jury) (citing <u>Vasquez v. Hillery</u>, 474 U.S. 254 (1986)).  Where any error in a state grand jury proceeding is rendered harmless by a subsequent petit jury verdict, there is no due process deprivation.  <u>See</u>, <u>e.g.</u>, <u>Lopez v. Riley</u>, 865 F.2d 30, 32 (2d Cir. 1989); <u>United States v. Mechanik</u>, 475 U.S. 66, 72-73 (1986) (involving a violation of Fed. R. Crim. P. 6(d)).

The Appellate Division rejected these claims on direct appeal.  Any error in the state grand jury proceedings was rendered harmless by the subsequent petit jury verdict.  Thus, Petitioner is not entitled to relief on these grounds.

**F.   <u>Ineffective Assistance of Counsel (Grounds 9, 12, 13).</u>**

In Ground 9 of his petition, Petitioner argues that counsel was ineffective for failing to challenge the indictment and the use of co-defendant Morton's statement before the Grand Jury.  In Ground 12 of his petition, Petitioner claims that counsel was ineffective in advising him not to testify at trial, and in Ground 13, Petitioner asserts that counsel was ineffective for "opening the door" to damaging testimony on redirect of Detective-Sergeant Ryan.

The Sixth Amendment, applicable to states through the Due Process Clause of the Fourteenth Amendment, guarantees the accused the "right ... to have the Assistance of Counsel for his defense." U.S. Const. amend. VI.  The right to counsel is the right to the effective assistance of counsel, and counsel can deprive a defendant of the right by failing to render adequate legal assistance.  See <u>Strickland v. Washington</u>, 466 U.S. 668, 686 (1984).

A claim that counsel's assistance was so defective as to require reversal of a conviction has two components, both of which must be satisfied.  See <u>Strickland</u>, 466 U.S. at 687. First, the defendant must "show that counsel's representation fell below an objective standard of reasonableness." <u>Id.</u> at 687-88.  To meet this prong, a "convicted defendant making a claim of ineffective assistance must identify the acts or

33

omissions of counsel that are alleged not to have been the result of reasonable professional judgment." Id. at 690.  The court must then determine whether, in light of all the circumstances at the time, the identified errors were so serious that they were outside the wide range of professionally competent assistance. See id.

To satisfy the prejudice prong, the defendant must show that "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695.  As the Supreme Court explained,

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.  Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways.  Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

Strickland, 466 U.S. at 695-96.

The Supreme Court instructs that a court need not address both components of an ineffective assistance claim "if the defendant makes an insufficient showing on one." Strickland, 466 U.S. at 697.  "If it is easier to dispose of an ineffectiveness

claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Id.

Petitioner's grounds regarding ineffective assistance of counsel were presented to the state courts in his PCR motion. The PCR judge, who was also the trial judge, cited Strickland and found that Petitioner was given "correct advice," that there was "no advice that fell below the standard of practice, and, secondly, there is no prejudice, there's no rational way that we could conceive of Mr. Bryant having been prejudiced by failing to testify." See Rta32 at 37:2-11.

The Appellate Division noted:

Despite defendant's failure to submit an affidavit or certification in support of his petition, the court considered his claims of ineffective assistance of counsel.  The judge appropriately analyzed defendant's claim under the standards of Strickland v. Washington, 466 U.S. 668, 694 (1984) and as adopted by State v. Fritz, 105 N.J. 42, 58 (1987).  After conducting this analysis, the judge found that defendant had failed to make out a prima facie case, and therefore an evidentiary hearing was not warranted.  State v. Cummings, 321 N.J. Super. 154, 170 (App. Div.), certif. denied, 162 N.J. 199 (1999) (finding bare allegations are insufficient to make out a prima facie claim of ineffective assistance sufficient to warrant an evidentiary hearing).

* * *

Based upon our review of the record, we are satisfied that the judge correctly analyzed the petition and that defendant's certification does not establish that his counsel performed deficiently and that he suffered prejudice as a result of such deficient performance. Consequently, we affirm substantially for the reasons expressed by Judge Sullivan in his oral opinion on June 23, 2005.

35

<u>State v. Bryant</u>, 2007 WL 2301612 at *2 (N.J. Super. App. Div. Aug. 13, 2007).

Petitioner's claims that counsel did not properly represent him are without merit.  As the state courts found, citing <u>Strickland</u>, a review of the record shows that counsel was competent and did not perform deficiently.  Evidence against Petitioner at trial was substantial, and Petitioner cannot show prejudice.  As noted, evidence against Petitioner included boasting in front of his brother that he intended to supplement his income from a fast food restaurant by robbing and killing (Rta11 at 136:2-7, 137:14, 138:8, 145:1 to 147:18); Petitioner and Morton armed themselves with large folding knives so as not to leave witnesses and wore latex gloves so as not to leave fingerprints (Rta11 at 138:12-17, 138:18-20, 139:23 to 143:20, 152:3-5, Rta19 at 76:4-15); before getting out of the car at the Amoco station, Morton advised Petitioner, "When I get out, I'm killing everyone around, 'cause I ain't leaving no witnesses behind" (Rta15 at 147:17-25, Rta18 at 78:23 to 79:25); aware of Morton's deadly intentions, Petitioner at the very least robbed the attendant's booth of money and cigarettes (Rta15 at 148:7-12, Rta18 at 80:21 to 81:4); Eck's statement to police prior to his death that he was attacked by two black men (Rta11 at 103:8-19); Petitioner's knife was the knife that inflicted the cardiac wound (<u>see</u> Rta19, Rta20); Petitioner's knife was recovered from inside

36

his sneaker, and his fingerprint was on the blade (Rta11 at 52:20 to 53:5, Rta15, Rta17 at 128:22 to 136:1, Rta18 at 12:15-19, 48:6 to 49:25); and Petitioner and Morton's statements implicating Petitioner (Ra20 to Ra 23).  In addition, there were statements of third party witnesses, the identification of Petitioner and Morton by witnesses in photographs, and DNA evidence.

Therefore, as the record reveals that the state courts relied on the Strickland standard in evaluating Petitioner's ineffective counsel claims, Petitioner has not shown, as required by 28 U.S.C. § 2254(d), that the actions of the trial court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Petitioner's claims will be denied.

## G.   **Jury Charge Claims (Grounds 10 and 15).**

In Ground 10, Petitioner contends that the trial judge gave an inappropriate charge on accomplice liability, as the charge did not instruct the jury that petitioner, if considered as an accomplice, might be involved in the underlying incident but with a lesser mental state than the actual murder and could be found guilty of a lesser offense even though the principle might be

37

guilty of murder.  In Ground 15, Petitioner argues that the trial judge gave an improper "corrective" charge on reasonable doubt.

As to the accomplice liability charge, the trial judge charged:

> Each participant thus may be guilty of a different degree of crime than the other, the degree of guilt depending entirely upon his own actions, intent and state of mind . . . . Thus, if you determine that the State has failed to prove beyond a reasonable doubt that [petitioner] inflicted stab wounds which contributed in any substantial way to the death of the victim, then you still have to determine whether the [petitioner] was an accomplice of Robert Morton.  If you see [petitioner] as the accomplice of Robert Morton, you must determine what's the mental state of [petitioner] in order to decide whether [petitioner] is guilty of murder, aggravated manslaughter, manslaughter, or aggravated assault by inflicting serious bodily injury.  I, therefore, instruct you and I hope I've made it abundantly clear that an accomplice can be guilty of a different degree of offense than the principal if the accomplice had a different mental state.  If you believe beyond a reasonable doubt that [petitioner] was an accomplice of Robert Morton, he can be guilty of a different degree of offense than Robert Morton, if you believe [petitioner] had a different intent or different culpability state than Robert Morton.

See Rta26 at 181:1 to 184:3.  This charge follows New Jersey case precedent and the model jury charges.

With regard to the reasonable doubt claim, this Court notes that after defense counsel gave examples of reasonable doubt during his closing arguments, the trial judge utilized the model jury charge for reasonable doubt to "correct" defense counsel's examples, as the judge and the prosecutor believed that they were inappropriate.

Petitioner raised these claims on direct appeal, and they were denied.

Generally, a jury instruction that is inconsistent with state law does not merit federal habeas relief.  Where a federal habeas petitioner challenges jury instructions given in a state criminal proceeding:

> ... the only question for us is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  It is well established that the instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record.  In addition, in reviewing an ambiguous instruction ..., we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.  And we also bear in mind our previous admonition that we "have defined the category of infractions that violate 'fundamental fairness' very narrowly."  "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation."

Estelle v. McGuire, 502 U.S. 62, 72-73, (1991) (citations omitted).  Thus, the Due Process Clause is violated only where "the erroneous instructions have operated to lift the burden of proof on an essential element of an offense as defined by state law."  Smith v. Horn, 120 F.3d 400, 416 (3d Cir. 1997); see also In re Winship, 397 U.S. 358, 364 (1970) ("the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged"); Sandstrom v. Montana, 442 U.S. 510, 523 (1979) (jury instructions that suggest a jury may

convict without proving each element of a crime beyond a
reasonable doubt violate the constitutional rights of the
accused).

In this case, this Court has reviewed the record, and notes
that there is no contention that the jury charge wrongly
described the burden of proof.  The state courts did not find any
error under state law with the charges, and this Court cannot
ascertain any error that would rise to the level of a
constitutional deprivation.

Further, a review of the record reveals that Petitioner has
not demonstrated that his entire trial and conviction was so
prejudiced by the charge as to violate the principles of
fundamental fairness and due process.  There was ample evidence
against Petitioner to justify his conviction, including
Petitioner's own statements.  Petitioner's conviction was based
on a credibility determination by the jury, who chose to believe
the State's witnesses over Petitioner's defense.  Petitioner's
conviction was neither fundamentally unfair, nor violated due
process.  Therefore, these grounds for relief will be denied.

**H.    Insufficiency of Evidence Claim (Ground 11).**

In Ground 11 of his petition, Petitioner argues that without
clear proof that Morton told the truth in his first and second
statements, the State did not have a case against Petitioner,
except for his "coerced" statement.

40

A sufficiency of the evidence claim is governed by Jackson v. Virginia, 443 U.S. 307, 318 (1979). "[I]n a challenge to a state criminal conviction brought under 28 U.S.C. § 2254-if the settled procedural prerequisites for such a claim have otherwise been satisfied-the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Id. at 324; accord McDaniel v. Brown, 130 S. Ct. 665, 666 (2010) (per curiam).

When assessing a sufficiency of the evidence claim in a § 2254 petition, the sufficiency of the evidence standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law ." Jackson, 443 U.S. at 324 n.16.  Jackson "requires a reviewing court to review the evidence in the light most favorable to the prosecution. Expressed more fully, this means a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" McDaniel, 130 S. Ct. at 673 (quoting Jackson, 443 U.S. at 326); see also House v. Bell, 547 U.S. 518, 538 (2006) ("When confronted with a challenge based on trial evidence, courts presume the jury resolved evidentiary disputes reasonably so long

41

as sufficient evidence supports the verdict.")).  The Court
emphasized that "the standard ... does not permit a court to make
its own subjective determination of guilt or innocence." <u>Jackson</u>
at 320, n.13.  Moreover, "a reviewing court must consider all of
the evidence admitted by the trial court, regardless whether that
evidence was admitted erroneously." <u>McDaniel</u>, 130 S. Ct. at 672
(citation and internal quotation marks omitted).

"[U]nder <u>Jackson</u>, the assessment of credibility of witnesses
is generally beyond the scope of review." <u>Schlup v. Delo</u>, 513
U.S. 298, 330 (1995).  The question is "whether, viewing the
evidence in the light most favorable to the state, it was
objectively unreasonable for the Appellate Division to conclude
that a rational trier of fact could have found, beyond a
reasonable doubt that [petitioner] was guilty[.]" <u>Kamienski v.
Hendricks</u>, 2009 WL 1477235 (3d Cir. May 28, 2009).

Here, Petitioner's argument that there was insufficient
proof for jury consideration of the charges ignores both the
testimony and the favorable permissible inferences from the
evidence.  As noted throughout this Opinion, there was ample
evidence for the jury to convict Petitioner of the murder,
robbery, and other charges for which he was convicted.

Petitioner has not shown that the Appellate Division's
rejection of Petitioner's sufficiency of the evidence claim was
contrary to, or an unreasonable application of, <u>Jackson v.</u>

<u>Virginia</u>.   Thus, Petitioner is not entitled to habeas relief on Ground 11.

### CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."   28 U.S.C. § 2253(c)(2).   "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."   <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 327 (2003).

Here, Petitioner has failed to make a substantial showing of the denial of a constitutional right.   No certificate of appealability shall issue.

### CONCLUSION

For the reasons set forth above, the petition will be denied.   An appropriate order follows.

                                   s/Renée Marie Bumb
                                   RENÉE MARIE BUMB
                                   United States District Judge

Dated: January 7, 2011